UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | NO. 2:07-CR-25 PS |
| | ) | |
| | ) | |
| ANGELA DIANE BENNETT and | ) | |
| JOSE JAVIER LOERA, JR. | ) | |

## OPINION AND ORDER

Defendants Jose Javier Loera and Angela Diane Bennett have moved to suppress evidence seized during a search of a car. The search was proper because Bennett, the driver of the car, consented to it and the police officers had probable cause in any event. Accordingly, the Motion to Suppress evidence is denied. Loera also has moved to suppress statements made after he requested a lawyer. The Court will address this Motion in a later opinion.

### I.  PROCEDURAL HISTORY

Before we begin the constitutional analysis at issue in these Motions, a summary of the procedural history involving the criminal prosecution of the two Defendants is required. Defendants were indicted on May 4, 2005 in case number 2:05-CR-66 in the Northern District of Indiana. Defendant Loera filed a Motion to Suppress on July 27, 2005, and the Court held a hearing on that motion on October 20, 2005. On December 27, 2005, the Court denied Loera's motion to suppress the evidence seized from the car. Nevertheless, we granted the motion to suppress Loera's statements as the government did not respond to his allegations that the officers should have stopped their interrogation after he requested counsel.

The case was subsequently continued several times for various reasons.[1]  On November 20, 2006, Defendants filed Motions to Dismiss their indictments.  Because the Court found that an over four-month delay was improperly excluded from the speedy trial computation, it granted Defendants' Motions to Dismiss without prejudice for violation of the Speedy Trial Act, 18 U.S.C. § 3161, on December 4, 2006.

The government then re-indicted Defendants on February 7, 2007 in the current case, 2:07-CR-25.  Loera filed the pending Motion to Suppress on April 4, 2007.  His motion and corresponding Memorandum are nearly identical to those filed in the original indictment.  Bennett, who did not file a Motion to Suppress in the first indictment, did so in this case also on April 4, 2007.  During a status conference held on April 12, Bennett's counsel represented to the Court that Bennett had no intention of claiming or testifying that her consent was involuntary.  Rather, similar to Loera, she argues that the traffic stop was unreasonably delayed and therefore unlawful.  Accordingly, the Court will rely heavily on its previous Order entered in case number 2:05-CR-66 in ruling on the pending Motions to Suppress.

## II.  FACTUAL BACKGROUND

On December 14, 2004 at approximately 9:12 a.m., Indiana State Police Troopers Jason Carmin and Mark Bloom were patroling Interstate Highway 65 in Tippecanoe County, Indiana in separate cars.  Bloom began to pursue a speeding vehicle which he pulled over.  Carmin meanwhile observed a green Ford Explorer change lanes without using a turn signal, which is a traffic violation for unsafe lane movement.  In addition, according to Carmin, the Ford Explorer

---

[1] *See* 12/4/2006 Order [DE 109] for a fuller description of the circumstances regarding the continuances.

also failed to yield to Bloom's squad car that was parked on the side of the road, which is another traffic violation.  Carmin therefore pulled the Ford Explorer over.

Besides the minor traffic violations, Carmin had other reasons to stop the Ford Explorer.  During the suppression hearing, Carmin testified that he had received information from Drug Enforcement Administration Special Agent Jay Bump, who gave him a description of the car that Bennett and Loera were driving and "explained to [Carmin] that it would be beneficial to stop the vehicle."  (Supp. Hrg. Tr. 17:7-8 (Case No. 2:05-CR-66 [DE 26]).)  According to Carmin, the federal agent did not give him any specifics about what might be inside the Explorer.  For example, DEA Agent Bump did not tell Carmin that there would be drugs in the Explorer.

Bennett was driving the Ford Explorer.  Loera was seated in the front passenger seat.  Bennett provided Carmin with a Texas driver's license.  Carmin noted that Bennett was nervous; her hands were visibly shaking.  Carmin asked Bennett to step out of the car.  Bennett complied although, according to Carmin, it took her nearly a minute to figure out how to open the car door.  Carmin asked her about her trip.  Bennett replied that she had traveled to Georgia with her boyfriend, Loera.  She stated that they had arrived in Georgia on Thursday, had visited with Loera's father for the holidays, now were driving to Chicago, and planned to return to Texas the next day.  Bennett mentioned that the Explorer belonged to her brother-in-law, whose name is Julio or Jose Avila.

Carmin then questioned Loera.  Loera provided an Illinois identification card and told Carmin that the car belonged to his brother-in-law.  Loera's story about the nature of his trip differed from Bennett's.  Loera told Carmin that he had been in Georgia visiting his sick father for a couple weeks when Bennett, his girlfriend, had come to pick him up.  Loera stated that he

3

spent a lot of time in Atlanta with his father, but could not describe where in Atlanta his father resided.

After questioning Loera, Carmin had Bennett return to her car while he wrote a warning ticket.  Carmin at this time requested that Trooper Bloom come to the location with a narcotics-detection dog.  Sometime while Carmin was writing the citation, Bloom arrived on the scene with Cocoa, a drug-sniffing dog.  Carmin then returned to the car, gave Bennett the written warning and her and Loera's documentation, told Bennett to drive safely, and asked if she had any questions.  Bennett responded that she did not and thanked Carmin for the warning.

Carmin walked a few steps away from the car but then paused and returned to the car.  Carmin noticed that Bennett had started to reach for the steering wheel, ready to leave the area.  Carmin interpreted this action as Bennett feeling free to leave the traffic stop.  Carmin then asked Bennett if he could ask her some additional questions.  Bennett agreed.  Carmin discussed problems with drug trafficking on the interstate highways.  He then asked Bennett if she had anything illegal in the car.  Bennett replied that she did not and began to open her car door.  Carmin then asked whether there were any drugs in the car, including marijuana, cocaine or heroin.  Bennett again replied no to all these questions as she continued to open the door and began to exit the car.  Carmin found this behavior – her exiting the car without being asked – "very unusual."  (Tr. 22:19-20.)  Carmin asked if he could search the car, and Bennett gave consent for a search.  At this point, Carmin did not inform Bennett that she could refuse consent.  Carmin asked Bennett to sit in his squad car, while he filled out a consent to search form and explained it to Bennett.  The consent to search form states that the individual can refuse to consent.  Bennett told Carmin that she understood the consent to search form and signed it.

4

While Bennett was in the squad car with Carmin, Bloom was running Cocoa around the exterior of the Explorer.  Cocoa sniffed the exterior of the car, and Bloom observed behavioral changes in Cocoa near the rear bumper area.  Bloom then permitted Cocoa to enter the car, and the dog honed in on the rear cargo area.  Bloom interpreted this behavior to mean that Cocoa had detected the odor of narcotics.  Carmin pulled up the carpet and found a door to a hidden compartment.  Carmin testified that, based on his training and experience, he recognized the compartment as a type commonly used by people trafficking drugs or other illegal contraband.  Both Bennett and Loera were then placed in handcuffs.  Carmin opened the compartment after determining that it had a magnetic switch.  Once opened, Carmin saw several packages (21, to be exact) wrapped in black tape.  Bennett and Loera claimed that they did not know anything about the car and that they had borrowed it.  One of the packages was cut open and contained a white powdery substance that field-tested positive for the presence of cocaine.  After Bennett and Loera were transported to Tippecanoe County jail, Carmin and a Tippecanoe county prosecutor wrote up a search warrant to remove the contraband from the car.

### III.  DISCUSSION

Loera and Bennett seek to suppress the evidence seized from the car because they "[were] detained beyond the time required for the initial traffic stop."  (Loera Mem. at 3.)  Loera states: "Once a traffic stop has been completed, the duration of the detention beyond that time is irrelevant because it is unlawful whether it is one second or one hour."  (*Id.*)  During the evidentiary hearing on the motion to suppress in case number 2:05-CR-66, Loera also argued that the stop was pretextual, that the consent provided by Bennett was involuntary, and that the federal agents should have obtained a search warrant.  We will address each argument in turn.

When a police officer observes a traffic violation, he may stop the offending vehicle. As the Supreme Court has noted: "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Once a stop is properly made, the "officer conducting [the] valid traffic stop can detain the occupants of the vehicle long enough to accomplish the purpose of the stop." *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005).

It is permissible for an officer to ask questions unrelated to the initial purpose of a traffic stop so long as it does not unreasonably extend the stop. *Id*. at 725. Therefore, only an unreasonable delay during a legal traffic stop is unlawful. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). For example, in *United States v. Childs*, 277 F.3d 947, 949-54 (7th Cir. 2002) (en banc), the court held that it was a reasonable extension of a traffic stop for an officer to ask the driver of the car questions about marijuana and to further inquire as to whether the driver would consent to a search of the car. *See also United States v. Carpenter*, 406 F.3d 915, 916-17 (7th Cir. 2005) (holding that a delay of at most five minutes while waiting for a drug-detection dog during a traffic stop for evading a red light was not unreasonable).

Here, Carmin conducted a valid traffic stop based on Bennett's changing lanes without using a turn signal and failing to yield to Bloom's squad car on the side of the road. Bennett's driving provided Carmin with probable cause to believe that Bennett had committed a traffic violation. He gave Bennett a warning ticket and turned away from the car. According to Carmin, Bennett had her hands on the wheel and was ready to leave, thus suggesting that she thought she was free to go. Carmin then asked for permission to ask some additional questions, and Bennett consented. The second round of questioning, although unrelated to the traffic stop,

6

was permissible and did not unreasonably prolong the stop. More importantly, Bennett voluntarily consented to the further questioning after she believed she was free to leave. *See United States v. Finke*, 85 F.3d 1275, 1281 (7th Cir. 1996) (encounter becomes consensual when a reasonable person would have believed he was free to go thus permitting questions unrelated to traffic stop); *United States v. Rivera*, 906 F.2d 319, 323 (7th Cir. 1990) (finding consent was voluntary where defendant was given written warning, identification and cue to leave).

Furthermore, after questioning Bennett and Loera during the traffic stop, Carmin was reasonably suspicious of their behavior and this provides another reason to have extended the traffic stop momentarily. "'Reasonable suspicion' means 'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity'" *United States v. Johnson*, 383 F.3d 538, 542 (7th Cir. 2004) (citation omitted). "[I]nformation lawfully obtained during [an initial traffic stop] may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 1181 (2006). That's what happened here. Bennett was pulled over for a legitimate reason and then other things developed that permitted prolonging the stop. First, Bennett was extremely nervous; her hands were shaking. It took her almost a minute just to open the car door. Then, later when she was back inside her car, she suddenly opened the car door a second time and tried to exit the car while Carmin was asking her questions. Carmin found this highly unusual. Finally, Bennett and Loera had inconsistent stories regarding their trip. Based on these factors, Carmin had a reasonable suspicion to believe that Bennett and Loera were engaged in criminal activity and to justify

7

further unrelated questions.  *See Rivera*, 906 F.2d at 322 (reasonable suspicions warranted limited questioning outside the scope of traffic-related investigation).

Loera also argues that Carmin's traffic stop for Bennett's lane violations was an impermissible pretext for pursuing a lead he received from federal agents.  But Supreme Court cases have repeatedly "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."  *Whren*, 517 U.S. at 813; *see also United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) ("Any ulterior motive an officer may have for making the stop is irrelevant.").  Rather, "the only relevant inquiry for Fourth Amendment purposes is whether the evidence, when objectively assessed, gave the officer probable cause for the stop."  *United States v. Rogers*, 387 F.3d 925, 934 n.9 (7th Cir. 2004).  Thus, despite the fact that Carmin obviously had an ulterior motive when stopping Bennett and Loera –  federal agents indicated to Carmin that it would be "beneficial" to stop the Explorer – Carmin committed no constitutional violation because he had probable cause that Bennett committed a traffic violation.

Loera further argues that the consent to search was involuntary because Bennett was held for a long time, she did not believe she could leave in her car when Carmin walked away, and she was not verbally advised that she could refuse the search.  Bennett herself has not alleged that her consent to search the car was involuntary.  The first question is whether Loera has standing to challenge the consent search of the car given by Bennett.  "[T]he relevant inquiry is whether [defendant]'s privacy interests in the [car] were violated by the search . . . ."  *United States v. Cellitti*, 387 F.3d 618, 621 (7th Cir. 2004).  In other words, if Loera had an expectation of privacy in the car, he can challenge the validity of the consent given by Bennett.  *See id.* at

8

621-22.  The record is scanty regarding whether Loera had an expectation of privacy in the car. However, although the car was borrowed from a third person, Loera and Bennett appear to have had common authority over the car.  *See United States v. Jensen*, 169 F.3d 1044, 1048 (7th Cir. 1999) (noting that defendant who was driving car that was searched and stepfather who owned car had at least "common authority over the car").  Therefore, Loera may properly challenge Bennett's consent to search the car.  *See id.* at 1048-49 (defendant challenged his stepfather's consent to search car defendant was driving but that stepfather owned).

The government can conduct a search based upon an individual's voluntary consent without a warrant or probable cause.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.") (citations omitted).  "Voluntariness [of consent] is a question of fact to be determined from all the circumstances . . . ."  *Id.* at 248-49.  In making this determination, the Court must review several factors, "including (1) the age, intelligence, and education of the person who gave consent, (2) whether she was advised of her constitutional rights, (3) how long she was detained before consenting, (4) whether she consented immediately or only after repeated requests by authorities, (5) whether physical coercion was used, and (6) whether she was in police custody at the time she gave her consent."  *Cellitti*, 387 F.3d at 622 (citing *Schneckloth*, 412 U.S. at 226).

Based on the evidence presented, Bennett's consent to the search was voluntary.  First, Bennett was advised of her constitutional rights when she reviewed the consent form with Carmin.  Second, Carmin did not detain her longer than necessary for a routine traffic stop. Third, Bennett consented to the search when asked the first time.  Fourth, there is no evidence

9

that physical coercion was used to obtain the consent.  And finally, Bennett was not in police custody when she consented to the search.  Therefore, once Bennett voluntarily consented, Carmin was lawfully permitted to search the car – which he did via a drug-sniffing dog.

Loera also claims that Carmin did not inform Bennett of her right to refuse the search, but the Supreme Court has rejected such a requirement.  *See Ohio v. Robinette*, 519 U.S. 33, 36 (1996) (holding that the Fourth Amendment does not "require[] that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary").  It was therefore not necessary for the police to inform Bennett that she could refuse to consent to the search.  *See Schneckloth*, 412 U.S. at 231-32 (noting that federal and state courts have repudiated the suggestion of advising a subject of a search of his right to refuse consent).  In any event, the argument is a nonstarter because Carmin did advise Bennett of her right to refuse the search while he was reviewing the consent form with her.

Finally, even if Carmin had not obtained voluntary consent, he still would have been permitted to perform an exterior canine sniff.  As the Supreme Court held, "[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."  *Caballes*, 543 U.S. at 410; *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) ("The fact that officers walk a narcotics-detection dog around the exterior of each car . . . does not transform the seizure into a search.").  The traffic stop in this situation was lawful – Carmin observed Bennett commit two traffic violations.  As noted earlier, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."  *Caballes*, 543 U.S.

10

at 407.  But in this case, the traffic stop was not unreasonably extended for the dog sniff.  Rather, Bloom and the dog came to the scene while Carmin was writing his citation.  Bennett and Loera were not forced to wait for the dog to arrive.

Then, once the dog changed his behavior at the rear of the car to indicate the presence of narcotics, the police officer had probable cause to search the car.  *See United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005) (noting the validity of the "automobile exception" to the warrant requirement "that permits the search of an automobile without a warrant when there is probable cause to believe that the search will uncover contraband or evidence of crime") (citations omitted).  "Probable cause exists if, given the totality of the circumstances, there is a 'fair probability' that the car contains contraband or evidence."  *United States v. McGuire*, 957 F.2d 310, 314 (7th Cir. 1992) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  Adding up all of the evidence described above (inconsistent stories, extreme nervousness, odd behavior) together with the positive alert by the dog, Carmin had probable cause to search the car even absent the consent.  Carmin was therefore permitted to search any part of the car, including the compartment where the drugs were ultimately found.  *United States v. Ortiz*, 84 F.3d 977, 983 (7th Cir. 1996) ("The scope of the [warrantless] search [under the automobile exception] may 'extend[] to all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments and trunks.'") (quoting *United States v. Young*, 38 F.3d 338, 340 (7th Cir. 1994)).

11

## IV.  CONCLUSION

Defendant Loera's Motion to Suppress [DE 17] is **DENIED** with respect to the evidence seized from the car.  Defendant Bennett's Motion to Suppress [DE 20] is **DENIED**.

**SO ORDERED.**

ENTERED: April 16, 2007

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
